**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

METROPOLITAN LIFE INSURANCE
COMPANY,
Plaintiff,

v.

BETTY T. PETTIT,                                            No. 97-2244
Defendant-Appellant,

v.

PATRICIA B. PETTIT,
Defendant-Appellee.

METROPOLITAN LIFE INSURANCE
COMPANY,
Plaintiff,

v.

PATRICIA B. PETTIT,                                         No. 97-2407
Defendant-Appellant,

v.

BETTY T. PETTIT,
Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-96-1311-A)

Argued: September 23, 1998

Decided: December 31, 1998

Before MURNAGHAN and WILLIAMS, Circuit Judges, and BULLOCK, Chief United States District Judge from the Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in which Chief Judge Bullock concurred. Judge Murnaghan wrote a separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Robert Eric Greenberg, FRIEDLANDER, MISLER, FRIEDLANDER, SLOAN & HERZ, Washington, D.C., for Appellant. Brian Stuart Chilton, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Glenn W. D. Golding, FRIEDLANDER, MISLER, FRIEDLANDER, SLOAN & HERZ, Washington, D.C., for Appellant. David G. Leitch, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Upon the death of one of its insured, Tom Pettit (Tom), Metropolitan Life Insurance Company (MetLife) sought to pay life insurance proceeds due under an Employee Retirement Income Security Act (ERISA) qualified plan. The designated beneficiary, Patricia Pettit (Patricia), who was Tom's widow, and Tom's former wife, Betty Pettit (Betty), both claimed a portion of the proceeds. Betty's claim was based on a property settlement agreement that she entered into with Tom in connection with their divorce. Faced with these competing claims, MetLife filed an interpleader action to determine the proper disposition of the insurance proceeds. Betty filed a cross-claim against Patricia seeking to enforce a constructive trust against the disputed proceeds. Both parties to the cross-claim filed competing motions for summary judgment.

Relying on ERISA's preemption clause, the district court held that Betty's claim was preempted because it was based upon state law that related to an employee benefit plan. The district court noted further that Betty had not employed a qualified domestic relations order (QDRO), the method ERISA provided for a divorced spouse to enforce property rights in an ERISA plan. Accordingly, the district court granted Patricia's motion for summary judgment and denied Betty's summary judgment motion. The district court also denied Patricia's motion for attorney's fees and costs.

On appeal, Betty contends that because an ERISA plan administrator should look outside of the plan provisions to allocate benefits properly and that this burden does not conflict with ERISA's policies, her constructive trust claim is not preempted. She also argues that although the district court did not reach the merits of her constructive trust claim, this Court may resolve those issues without remand. Patricia filed a cross-appeal challenging the district court's denial of her attorney's fees and costs. Because we agree that ERISA preempts the constructive trust claim and that no attorney's fees should be awarded in this case, we affirm the judgment of the district court.

I.

During divorce proceedings in 1989, Tom and Betty Pettit divided their marital property through a property settlement agreement, which was incorporated but not merged into their divorce decree, and a separate QDRO that was entered by the Circuit Court of Fairfax County, Virginia. The property settlement agreement provided for a division of personalty and realty, the payment of spousal support, and other general matters. That agreement also specifically required Tom to maintain $200,000 of life insurance benefits in favor of Betty[1] and to transfer to Betty ownership of several life insurance policies issued by Connecticut Mutual, American Mutual, and Prudential. The transferred policies are not at issue in this appeal. The QDRO transferred to Betty one-half of Tom's interest in his income savings plan, which

_____

[1] The life insurance provision also required Tom to provide at least annual proof of compliance therewith. Betty never received or requested such proof.

3

was maintained through his employer, but it made no mention of life insurance benefits.

This appeal concerns the life insurance policy that Tom carried through his employer, the National Broadcasting Company (NBC), which was administered by MetLife. This life insurance policy was subject to the provisions of ERISA; it was not specifically mentioned in the property settlement agreement. Tom also owned and privately maintained other life insurance policies. The beneficiary designations on the policies were changed frequently, but at Tom's death, Betty was not named as the beneficiary of either the MetLife policy or any other policy that would fulfill the property settlement agreement's $200,000 insurance obligation.[2] Unbeknownst to Betty, Tom had designated his then wife, Patricia, as the beneficiary of the MetLife plan.

Seeking to enforce the property settlement agreement, Betty presented a claim to MetLife for a portion of the life insurance proceeds. Faced with competing payment obligations because Betty's claim clearly conflicted with the plan's beneficiary designation, MetLife filed an interpleader action in the United States District Court for the Eastern District of Virginia naming Betty Pettit and Patricia Pettit as defendant-claimants. Betty then filed a counterclaim against MetLife, which she later dismissed via consent order, and a cross-claim against Patricia to enforce a constructive trust against the MetLife proceeds. Upon cross motions for summary judgment, the district court granted Patricia's motion and denied Betty's. Subsequently, the district court denied Patricia's motion to obtain attorney's fees and costs from Betty. This appeal followed.

II.

The threshold question in this case is whether ERISA preempts the enforcement of a property settlement agreement against life insurance benefits paid through an ERISA-governed plan. Betty asks that we impose a constructive trust upon the life insurance proceeds if we find that ERISA does not preempt her claim.

_____

[2] The other policies variously named his children or Patricia as the beneficiaries.

4

We review the district court's grant of Patricia's motion for summary judgment de novo. See M & M Med. Supplies & Serv. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992) (en banc). If there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, then summary judgment is appropriate. See Fed. R. Civ. P. 56(c); M & M Medical, 981 F.2d at 162-63. As the district court found and the parties agree, there are no material facts in dispute. Our inquiry, therefore, necessarily extends only to the application of the law in this case.

In any inquiry involving statutory construction, we begin with the language of the statute itself. Commonly known as ERISA's preemption provision, 29 U.S.C.A. § 1144(a) states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C.A. § 1144(a) (West 1985). This provision is supplemented by two statutory definitions. The first broadly defines state law as "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C.A. § 1144(c)(1) (West 1985). The second defines employee benefit plan as a welfare or pension benefit plan. See 29 U.S.C.A.§ 1002(3) (West Supp. 1998). ERISA also states that life insurance plans qualify as welfare plans. See 29 U.S.C.A. § 1002(1) (West Supp. 1998) (defining welfare plan as "any plan, fund or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance . . . benefits in the event of . . . death").

From the statute's text, it is clear that the life insurance policy qualifies as a welfare plan, and it is thus an employee benefit plan. The parties agree, at least on this point. We also have no trouble determining that the constructive trust claim, which is based upon the terms of a property settlement agreement entered to effect a property division upon divorce, meets the ERISA definition of state law. This Court has often held such claims to be within state law and thus subject to preemption. See, e.g., Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1480 (4th Cir.) (holding that state tort law and contract claims related to ERISA plan administration are preempted), cert. denied, 117 S. Ct. 54 (1996); Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994) (en banc) (noting the preemption of, inter alia, state

5

law contract claims against an ERISA plan). Having concluded that state law is at issue and that we are dealing with an ERISA-defined employee benefit plan, the only remaining question is whether they "relate to" each other as that term is used in § 1144(a).

Unfortunately, that term is not so clearly defined and, not surprisingly, this is not the first time the courts have faced difficulty in applying it. Taken at its face value, the term "relates to" has no logical boundary. See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 115 S. Ct. 1671, 1677 (1995). In one way or another, everything relates to everything else. See id. As the United States Supreme Court has stated, "We simply must go beyond the unhelpful text and the frustrating difficulty of defining [relates to] . . . ." Id.

Section 1144(a), however, makes one thing clear, and that is that Congress intended to preempt state law. See 29 U.S.C.A. § 1144(a). "Where, as here, Congress has included in legislation a specific provision addressing -- and indeed, entitled -- pre-emption, the Court's task is one of statutory interpretation -- only to identify the domain expressly pre-empted by the provision." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 532 (1992) (Blackmun, J., concurring in part and in the judgment, and dissenting in part) (internal quotation marks omitted). Because § 1144(a) asserts Congress's power to supersede state law, the Supreme Court often has invoked traditional preemption principles to give it effect. See Travelers Ins. Co., 115 S. Ct. at 1676; see also California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 117 S. Ct. 832, 843 (1997) (Scalia, J., concurring) (noting that the Court now applies traditional preemption principles to ERISA preemption questions).

When addressing preemption, federal courts are appropriately reluctant to displace state law and, accordingly, begin with the presumption that "Congress does not intend to supplant state law." Travelers Ins. Co., 115 S. Ct. at 1676; see Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1467 (4th Cir. 1996). Nevertheless, when Congress expresses its intention clearly to do so through its constitutionally appointed legislative power, the Supremacy Clause establishes that federal law supersedes state law that either directly, by implication, or by express provision conflicts with federal law. See U.S.

6

Const., art. VI, § 2; Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203-04 (1983). Put another way, where the "`law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress,' federal preemption occurs." John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 99 (1993) (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984)). In Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983), the Supreme Court stated that under the unique language of § 1144(a), a state law relates to an employee benefit plan if it has a connection with, or a reference to, such a plan. See Dillingham Constr., N.A., 117 S. Ct. at 837 (citing Shaw, 463 U.S. at 96-97).

Using the Shaw standard, it is obvious that a constructive trust claim against a plan beneficiary, which arises from a domestic relations agreement and directly affects the distribution of plan benefits, has a connection with an ERISA plan. Congress made as much clear, for ERISA itself addresses interests that may arise in plans pursuant to a domestic relations action. See 29 U.S.C.A. § 1056(d) (West Supp. 1998)[3]; Hopkins v. AT&T Global Info. Solutions Co., 105 F.3d 153, 155-56 (4th Cir. 1997) (describing the requirements for a QDRO). Such a clear signal from Congress about what it considers to relate to an ERISA plan cannot be ignored. This action, therefore, easily numbers among those that are subject to preemption under the broad standard announced in Shaw.

The more traditional conflict preemption test yields the same answer, because the application of the state law claim does, in this case, interfere with congressional goals. ERISA's express purpose is

> to protect interstate commerce and the interests of partici-
> pants in employee benefit plans and their beneficiaries, by
> requiring the disclosure and reporting to participants and
> beneficiaries of financial and other information with respect

_____

[3] "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated. . . . Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." 29 U.S.C.A. § 1056(d) (West Supp. 1998).

thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C.A. § 1001(b) (West 1985). Reading both this text and the entirety of ERISA, courts previously have determined that ERISA was intended to establish exclusive federal regulation over employee benefit plans. See Travelers Ins. Co., 115 S. Ct. at 1677 (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)). In Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990), the Supreme Court determined that economic considerations supported Congress's decision to subject employee benefit plans to only one body of national, uniform law because ERISA would thereby minimize administrative and financial burdens on employers. See id. at 142; Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1468 (4th Cir. 1996) (noting the Supreme Court's guidance). State laws that obstruct the accomplishment of those goals must give way to ERISA.

We have determined that at least three specific categories of state laws sufficiently impact employee benefit plans and ERISA's purposes such that they must be superseded. See Coyne & Delany, 98 F.3d at 1468. These categories are: (1) laws that"mandate employee benefit structures or their administration"; (2)"laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself"; and (3) "`laws providing alternate enforcement mechanisms' for employees to obtain ERISA plan benefits." LeBlanc v. Cahill, 153 F.3d 134, 147 (4th Cir. 1998) (quoting Coyne & Delany, 98 F.3d at 1468 (citing Travelers Ins. Co., 115 S. Ct. at 1678-79)). In Coyne & Delany, we restated this Court's position that if a state law of general applicability was in question, it would not be preempted unless it affected relations between traditional plan entities including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries. See Coyne & Delany, 98 F.3d at 1469 (citing Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir. 1996)). We also have noted that designating the beneficiary of an ERISA life insurance plan sufficiently relates to a plan to come within the scope of the preemption clause. See Phoenix Mut. Life Ins. Co. v. Adams, 30 F.3d 554, 560 (4th Cir. 1994); see also, e.g., Brandon v. Travelers Ins. Co., 18

8

F.3d 1321, 1325 (5th Cir. 1994); Krishna v. Colgate Palmolive Co., 7 F.3d 11, 14-15 (2d Cir. 1993); MacLean v. Ford Motor Co., 831 F.2d 723, 727-28 (7th Cir. 1987). The question thus becomes whether the claim at issue falls within these impermissible categories.

In answering this question, it is once again worth noting that ERISA, by its own terms, provides a method for a former spouse to secure an interest in plan benefits. See, e.g. , Hopkins v. AT&T Global Info. Solutions Co., 105 F.3d 153, 157 (4th Cir. 1997) (noting that a former spouse's interest in pension plan benefits"can be protected simply by obtaining a QDRO"). Under § 1144(b)(7), QDROs, as defined by § 1056(d)(3), are specifically excepted from preemption. See 29 U.S.C.A. §§ 1144(b)(7), 1056(d)(3) [4] (West 1985 & Supp. 1998). Two strong inferences flow from the QDRO exception. First, Congress understood that such state law domestic proceedings may "relate to" a plan such that the enforcement of a provision requiring payment from employee pension or welfare benefits would, absent the exception, be preempted. See Boggs v. Boggs, 117 S. Ct. 1754, 1763 (1997) (noting that "QDRO's, unlike domestic relations orders in general, are . . . exempt from ERISA's general preemption clause"). Second, and more important to the question at hand, Congress meant to make a QDRO the acceptable method for a divorced spouse to attach an interest in a former spouse's benefit plan. ERISA thus maintains its own enforcement mechanism for aggrieved former spouses.[5]

_____

[4] To qualify as a QDRO, a court must create or recognize the interest in the ERISA plan and the order must include pertinent information such as mailing addresses and the amount and manner of payment. See 29 U.S.C.A. § 1056(d)(3) (West Supp. 1998). The statute also places limits on the effect of the QDRO. See id.

[5] We note that 29 U.S.C.A. § 1056(d) restricts the alienation of pension plan benefits, and does not speak to welfare plan benefits. See 29 U.S.C.A. § 1056(d) (West Supp. 1998) (stating that "pension plan . . . benefits provided under the plan may not be assigned or alienated"). Section 1144, however, does not limit similarly the scope of preemption. See 29 U.S.C.A. § 1144(a) (West 1985) (stating that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"). Furthermore, the statutory exception to the preemption clause, 29 U.S.C.A. § 1144(b)(7), references only the QDRO definition, and not the scope of the anti-alienation provision.

In this case, the property settlement agreement, which does not qualify as a QDRO, provides an alternate mechanism to obtain plan benefits and thus falls into the third category of preempted laws. The interference among the traditional parties is clear because ERISA requires that a "fiduciary discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan." 29 U.S.C.A. § 1104(a) (West Supp. 1998). The life insurance beneficiary designation was the plan instrument that governed the payment of the death benefits. If that designation is trumped by an external contract, such as the property settlement agreement, then the relationships between the employee and the plan, the plan and the named beneficiary, and the administrator and the plan will all be impacted by an outside agreement of which the administrator will likely be unaware. This situation leads to unpredictability, whereas a QDRO, which must be filed with a plan administrator,**6** provides notice and predictability for the plan administrator, participants, and beneficiaries. Not only is a claim under a property settlement agreement an alternate enforcement mechanism that impacts the traditional parties,

_____

See 29 U.S.C.A. § 1144(b)(7) (West Supp. 1998) ("[The preemption clause] shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title) .. . ."). Thus, read literally, the preemption provision applies to both welfare and pension plans. We "prefer a literal reading of ERISA" to a"flexible reading." Metropolitan Life Ins. Co. v. Wheaton, 42 F.3d 1080, 1083 (7th Cir. 1994) (concluding that the QDRO exception to the preemption provision applies to all ERISA plans, not just pension plans). The Tenth Circuit and the Sixth Circuit also have concluded that the QDRO exception applies to all ERISA plans. See Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415, 421 (6th Cir. 1997); Carland v. Metropolitan Life Ins. Co., 935 F.2d 1114, 1119-20 (10th Cir. 1991). The preemption provision thus applies equally to all ERISA plans, and is not limited to pension plans.

**6** The concurrence misinterprets our use of the term "filed." According to the statute, the plan administrator must "receive" the QDRO and we imply nothing more. See 29 U.S.C.A. § 1056(d)(3)(G) (West 1998). The certainty that underlies a QDRO does not arise from some formal filing process, but instead from a plan administrator's ability to determine conclusively who is entitled to the ERISA benefits by looking to a single qualifying order -- the QDRO.

10

it is also exactly the situation that Congress sought to avoid when it enacted ERISA.

Betty's constructive trust claim, which is based upon a property settlement agreement, if allowed to stand, would directly conflict with ERISA's goal of providing a nationally uniform plan administration and reduce the QDRO provisions to a meaningless footnote in the preemption context. Undoubtedly, this claim would also reduce the certainty of plan administration and increase litigation, along with the associated costs. We would allow state law to escalate the administrative costs that Congress sought to decrease. There could hardly be a more striking example of a state claim hindering the full accomplishment of congressional objectives. Because the claim interferes with Congress's clear objectives and conflicts with the plain language of ERISA, it must fall victim to the ERISA preemption provision.

Betty's argument that the preemption clause does not apply to cases such as these is unpersuasive. She contends that looking outside of the plan provisions to determine the proper disposition of benefits does not burden the plan administrator. She first mistakenly relies on this Court's decision in Estate of Altobelli v. International Bus. Mach. Corp., 77 F.3d 78 (4th Cir. 1996), which construed the application of ERISA's anti-alienation clause, 29 U.S.C.A. § 1056(d)(1), not the preemption clause. See 29 U.S.C.A. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). Construing that clause as a spendthrift provision, we determined that a plan administrator could be compelled to look outside of the plan documents to determine whether a designated beneficiary had waived an interest in plan benefits. See Altobelli, 77 F.3d at 81-82. But, as we stated at the beginning of our discussion in Altobelli, "ERISA does not address this topic directly, so federal courts may resolve it by developing federal common law." Id. at 80. That is not the case here. Section 1144 preempts all state law that relates to an ERISA plan, while specifically excepting QDROs. See 29 U.S.C.A. § 1144(a), (b)(7). ERISA directly addresses the topic at hand, and there is no room for us to countermand the statutorily expressed intent of Congress.**7**

_____

**7** We agree with the concurrence when it asserts that welfare benefits may be assigned without using a QDRO. See 29 U.S.C.A. § 1056(d)(1)

11

Betty also supports her argument with a case from the Eighth Circuit, Equitable Life Assurance Soc'y of United States v. Crysler, 66 F.3d 944 (8th Cir. 1995). In that case, the Eighth Circuit held that a divorce decree, which specifically required the assignment of ERISA welfare benefits to the participant's spouse, was not preempted by ERISA. See id. at 948. To support its holding, the court relied partly upon its reading of the Supreme Court's decision in Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 836-38 (1988), which determined that welfare benefits could be alienated without violating § 1056(d)(1). The Eighth Circuit reasoned that because ERISA did not prohibit the alienation or assignment of welfare benefits, then those assignments could not conflict with ERISA and thereby be preempted. See Crysler, 66 F.3d at 948. We disagree.

ERISA contemplates just such a scenario. ERISA allows the alienation of welfare benefits as the Supreme Court held in Mackey. See Mackey, 486 U.S. at 836-38. ERISA, however, does not stop there. It further specifies how such an alienation or assignment should be accomplished in the domestic relations context -- through a QDRO. See 29 U.S.C.A. §§ 1056(d)(3)(A), 1144(b)(7) (exempting only QDROs from the anti-alienation and preemption provisions). We join other courts who have read the statutes similarly. See Boggs, 117 S. Ct. at 1763 (noting that only QDROs, not domestic relations orders in general, are saved from ERISA's general preemption provision and pension plan alienation provision); Mattei v. Mattei, 126 F.3d 794, 809 (6th Cir. 1997) ("Where there is no QDRO . . . awards of property pursuant to divorce decrees must fall before conflicting designations of ERISA beneficiaries."), cert. denied , 118 S. Ct. 1799 (1998); Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415, 420-21 (6th Cir. 1997) (holding that although any domestic relations order might not

_____

& (d)(3). We also agree that ERISA's preemption clause would bar any state law domestic relations order from attaching ERISA plan benefits, pension or welfare, if it did not qualify as a QDRO. See 29 U.S.C.A. § 1144(a) (West 1998). However, the concurrence's assertion that federal common law could somehow overcome ERISA's plain mandate, which provides that a QDRO is the proper method for attaching benefits in the domestic relations context, stretches too far. Certainly, Congress could amend ERISA to provide for an alternate enforcement mechanism, but the courts cannot.

12

be barred by the anti-alienation provision, ERISA preempts all orders except those that meet the strictures of a QDRO); Fox Valley & Vicinity Const. Workers Pension Fund v. Brown, 897 F.2d 275, 279 (7th Cir. 1990) (en banc) ("ERISA preempts any attempt to alienate or assign benefits by a domestic relations order if that order is not a QDRO"). If we were to hold that ERISA did not preempt run-of-the-mill domestic relations agreements, which were not barred by the anti-alienation provision, then we effectively would read the preemption provision exception, § 1144(b)(7), and the referenced QDRO provision, § 1056(d)(3), out of existence, thus violating a fundamental precept of statutory interpretation.**8** Cf. Travelers Ins. Co., 115 S. Ct. at 1679-80. We believe Congress made itself clear on this point -- unless a domestic relations settlement complies with the QDRO requirements, ERISA preempts its enforcement through a state law mechanism such as a constructive trust.

_____

**8** We note that a recent decision by the Ninth Circuit, Emard v. Hughes Aircraft Co., 153 F.3d 949 (9th Cir. 1998), enforced a surviving spouse's community property interest in an ERISA welfare plan via constructive trust, despite the fact that the beneficiary designation form still named a former spouse. We must disagree with that decision, just as we did with Equitable Life Ins. Co. v. Crysler, 66 F.3d 944 (8th Cir. 1995).

In the Emard opinion, the Ninth Circuit noted both that the Supreme Court had approved garnishment of ERISA benefits in Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825 (1988), and that in Guidry v. Sheet Metal Workers National Pension Fund , 493 U.S. 365, 372 (1990), the Court determined that a constructive trust was synonymous with garnishment. See Emard, 153 F.3d at 954. Importantly, neither of these Supreme Court decisions involved domestic relations orders. In Marsh, the Sixth Circuit addressed an argument similar to the Ninth Circuit's holding in Emard. See Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415, 420-21 (6th Cir. 1997). As that decision stated, attaching welfare benefits to satisfy a debt is not addressed by ERISA. See id. Designating a beneficiary of welfare benefits is addressed, however, as is the procedure to be followed in the case of divorce. See id. Surprisingly, the Ninth Circuit's opinion fails to make even a passing reference to the relevance of the QDRO provisions. We find the reasoning of Emard unpersuasive and agree with the Sixth Circuit's holding in Marsh.

13

Because we determine that Betty's claim is preempted, we need not decide whether this Court could properly enforce a constructive trust against the plan proceeds without benefit of first remanding the case to the district court.

III.

Patricia cross-appeals the district court's ruling denying payment of her attorney's fees and costs. ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. § 1132(g)(1) (West 1985). We review the denial of fees to determine whether the district court abused that discretion. See Reinking v. Philadelphia American Life Ins. Co., 910 F.2d 1210, 1217 (4th Cir. 1990).

We have established a five-factor test to determine whether attorney's fees should be awarded. See Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1028-29 (4th Cir. 1993) (en banc); Reinking, 910 F.2d at 1217-18. These factors are:

> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorney's fees;
>
> (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
> (5) the relative merits of the parties' positions.

Denzler v. Questech, 80 F.3d 97, 104 (4th Cir. 1996).

> [This] "five factor approach is not a rigid test, but rather provides general guidelines for the district court." Indeed, we

14

have recognized that some of the factors may not be appropriate in any given case. Nonetheless, we require the district court to justify an attorney's fee determination by evaluating the five factors in order to give us some basis for review.

Id. (citing and quoting Quesinberry, 987 F.2d at 1029).

The district court properly applied the factors to Patricia's motion seeking fees. The district court determined that Betty's actions were neither frivolous nor in bad faith and that the relative merits of the parties' positions did not weigh in favor of a fee award. See Metropolitan Life Ins. Co. v. Pettit, Civ. No. 96-1311-A (E.D. Va. Sept. 11, 1997). The district court further stated that because Betty's claim was legitimate, it was unnecessary to impose fees to deter others from the same conduct and that there was no evidence that Betty would be able to satisfy the fee imposition. See id. Finally, Patricia was protecting only her own interests and was not attempting to benefit others. See id.

We agree with the reasoning of the district court and accordingly find no abuse of discretion.

IV.

Because we agree with the district court's grant of summary judgment in favor of Patricia Pettit and find no abuse of discretion in its denial of attorney's fees, we affirm the judgment.

AFFIRMED

MURNAGHAN, Circuit Judge, concurring:

I agree that the proper result is that Betty Pettit is not entitled to any of the life insurance proceeds from the ERISA welfare plan and that she cannot succeed in establishing a state law constructive trust claim. Under the amendments to ERISA in the Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 (1984), ERISA's preemption provision does preempt Betty's state law constructive trust claim because it is based on a state law domestic relations order that is not

15

a Qualified Domestic Relations Order (QDRO), 29 U.S.C.A. §§ 1144(a), 1144(b)(7) (West 1985 & Supp. 1998).

However, in my view ERISA does not require a divorce order to be a QDRO for it to alienate or assign ERISA welfare plan benefits. While state law (including a state law divorce order that is not a QDRO) is preempted, that means only that the legal question raised is governed by federal law. So, with respect to Betty's claim against the welfare plan here, it would be barred by ERISA as against any state law claim. Yet Betty might rely, not on a state law claim, but on any applicable provisions of the ERISA statute itself or on federal common law where ERISA is silent. See Phoenix Mutual Life Ins. Co. v. Adams, 30 F.3d 554, 563 (4th Cir. 1994) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989), and Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987)); Singer v. Black & Decker Corp., 964 F.2d 1449, 1452 (4th Cir. 1992). In such a case, if the ERISA statute or federal common law provided her a route to follow, Betty would not be barred by her failure to obtain a QDRO. Consequently, noting that we deal with a welfare plan here, I do not accept the statement by the Court that the lack of a QDRO would cause Betty's failure whatever route she might take. See 29 U.S.C.A. § 1056(d)(1) (West Supp. 1998) (ERISA's anti-alienation provision applies only to pension plans, not welfare plans). Cf., e.g., Estate of Altobelli v. International Business Machines Corp. , 77 F.3d 78 (4th Cir. 1996) (allowing the contents of an apparently pre-empted state divorce order and its underlying property settlement agreement to determine an issue under federal common law); Fox Valley & Vicinty Const. Workers Pension Fund v. Brown, 897 F.2d 275 (7th Cir. 1990) (en banc) (same; court stated explicitly that state law on the issue was pre-empted under 29 U.S.C. § 1144(a)).

But having a method by which Betty could yet proceed to recover from the welfare plan despite the absence of a QDRO, she premised her claim exclusively upon state law, and that state law claim is pre-empted by ERISA.

Hence, I concur in the result reached by the majority. Yet I wish to preserve, in case a similar issue should arise again, the argument that a QDRO is not necessary to pursue successfully a welfare plan

16

by a federal approach, either under ERISA or, in its silence, under the federal common law.*

_____

*Separately, I note that I do not accept the majority's statement that a QDRO must be filed with a plan administrator, if by that statement the majority means that a divorce order that meets all of the requirements of 29 U.S.C.A. §§ 1056(d)(3)(B) - (E) is ineffective unless formally "filed" with the plan administrator. I am not familiar with any section of ERISA or any case law that imposes a formal filing requirement. Section 1056(d)(3)(G) indicates that a plan administrator must eventually receive the QDRO. If a QDRO is effective merely upon the plan administrator's eventual receipt of the QDRO (and before payment), then the notice and predictability benefit of a QDRO over other domestic relations orders as proposed by the majority evaporates. Cf. Fox Valley, supra, 897 F.2d at 282 (noting duty of plan administrators to investigate marital history and existence of any domestic relations orders; implying a QDRO is effective "when it becomes known to the Fund before payment").

17